IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | |
|---|---|
| WADE PARK LAND HOLDINGS, LLC;<br>WADE PARK LAND, LLC; and<br>THE THOMAS FAMILY TRUST,<br><br>Plaintiffs,<br><br>v.<br><br>JONATHAN KALIKOW;<br>WP DEVELOPMENT PARTNERS, LLC;<br>GAMMA LENDING OMEGA, LLC;<br>GAMMA REAL ESTATE CAPITAL, LLC;<br>GRE WP, LLC; and<br>BLAKE GOODMAN,<br><br>Defendants. | CIVIL ACTION FILE<br><br>NO. 3:20-cv-176-TCB |

**O R D E R**

This case comes before the Court on Defendant Blake Goodman's motion [13] to dismiss the first amended complaint for failure to state a claim, as well as his motion [15] for oral argument. Also before the

Court is the motion to transfer [14] filed by Defendants Jonathan Kalikow; WP Development Partners, LLC ("WPDP"); Gamma Lending Omega, LLC ("GLO"); Gamma Real Estate Capital, LLC ("Gamma"); and GRE WP, LLC ("GRE").

## I. Background

There is a stretch of land in Frisco, Texas known as the $5 Billion Mile. Developments in that stretch include the Dallas Cowboys' headquarters and training facilities, Toyota Stadium, and several mixed-use retail and residential projects.

Between 2012 and 2015, commercial real estate developer Stanley Thomas, acting through his corporate affiliates, acquired 176 acres of farmland along the $5 Billion Mile. Thomas designed a large, multi-use development that would include two office towers, five hotels, 2,400 residential housing units, and over one million square feet of retail space. The project, which was forecasted to exceed $2 billion in developed value, became known as Wade Park.

To fund the acquisitions, Thomas-affiliated entities obtained purchase mortgage loans from two commercial real estate lenders, non-parties Bridge Capital, LLC and BAMCAP Partners, LP.

The Wade Park development was later separated into two parcels: the north property and the south property. Non-party Lebanon 390WR, which is managed by Thomas, took title to the north property using the Bridge Capital loan. Plaintiff Wade Park Land, LLC ("WPL"), also managed by Thomas, took title to the south property using the BAMCAP loan.

The Bridge Capital loan to Lebanon and the BAMCAP loan to WPL were set to mature in 2017, but the project remained unfinished and Thomas required additional funding.

In October 2016, Defendant Gamma Real Estate Capital LLC ("Gamma") agreed to lend a Thomas-affiliated entity $196 million using a bridge loan (the "Gamma Bridge loan"). The Gamma Bridge loan was to be used to both complete construction on the Wade Park project and pay off the Bridge Capital loan. The terms of the loan mandated that Plaintiff Wade Park Land Holdings, LLC ("WPLH") and WPL (together,

the “Wade Park Plaintiffs”) share certain information with Gamma, including details about the development of Wade Park and Thomas’s other properties—for instance, possible financing options, potential business partners, and internal projections about future value.

In November 2016, Thomas and Gamma agreed to change the terms of the Gamma Bridge loan. The loan amount was reduced to $139 million, and Gamma was given a second lien behind BAMCAP on the south property. Gamma and BAMCAP also entered into an intercreditor agreement that cross-collateralized and cross-defaulted the BAMCAP and Gamma Bridge loans.

In December 2016, Thomas and Gamma agreed to change the terms of the Gamma Bridge loan again. First, the loan amount was reduced to $83 million. Second, Defendants WPDP, GLO, GRE, and Gamma (collectively, the “Gamma Defendants”) were given a 75 percent interest in a new entity, non-party Wade Park Ventures, LLC (“WPV”), which controlled the two entities—WPL and WPLH—with ownership of the north and south Wade Park properties. The Gamma Defendants would retain their 75 percent ownership stake in WPV absent

repayment of the Gamma Bridge loan within 60 days of its maturity. In other words, the Gamma Defendants would own 75 percent of the Wade Park project unless the Gamma Bridge loan was repaid within 60 days.

Gamma and BAMCAP also entered into an intercreditor agreement giving Gamma the option to purchase the BAMCAP loan if WPL defaulted. The terms of this agreement also required that WPL get consent from Gamma before modifying the loan.

Construction continued.

In January 2018, the BAMCAP loan was set to mature. Thomas approached BAMCAP about a one-month extension, but in late January, Gamma withheld consent to the proposed modification of the loan. The BAMCAP loan matured, and WPL defaulted. Because of the November 2016 intercreditor agreement cross-defaulting the BAMCAP and Gamma Bridge loans, the Gamma Defendants were then able to declare default on the Gamma Bridge Loan as well.

Rather than face a foreclosure sale pursuant to the Gamma Bridge loan, WPL and WPLH subsequently entered into three forbearance agreements with the Gamma Defendants. As a term of these

forbearance agreements, Thomas was required to inform the Gamma Defendants of his efforts to secure financing to pay the Gamma Bridge loan.

Thomas attempted to refinance the loans on three of his other properties to obtain the requisite cash for the Gamma Bridge loan, but the Gamma Defendants subsequently purchased the loans he attempted to refinance. The Gamma Defendants also spoke with two other prospective lenders with whom Thomas had spoken; the lenders later backed away from their initial interest in providing additional financing for the Wade Park project.

In March 2018, non-party Dan Cathy agreed to invest in Wade Park. Defendant Blake Goodman, an associate of Cathy's, was named manager for the project. He was also named manager of a holding company, non-party Fourth Quarter Properties XLIX ("FQP"), whose members include Thomas; Cathy; non-party Little Suwanee Holdings, LLC; and Goodman.

Effective in July 2018, FQP, Cathy, Thomas, WPL, WPLH, and non-party River's Rock Properties entered into a written joint venture

agreement. Goodman signed the agreement as a manager of River's Rock.

Also in July, Gamma purchased the BAMCAP loan. It now owned all loans encumbering Wade Park. WPL and WPLH then entered into three more forbearance agreements with Gamma. Unlike the earlier forbearance agreements, which applied to the Gamma Bridge loan only, these agreements applied to the Gamma Bridge and BAMCAP loans.

On February 4, 2019, the sixth forbearance agreement was set to expire. Rather than enter into a seventh such agreement, WPH and WPLH entered into a deed-in-lieu-of-foreclosure agreement with the Gamma Defendants. Gamma would receive deeds to the north and south Wade Park properties but would hold them in escrow, provided that WPL and WPLH made certain payments. They also agreed to a six-week written buy-back agreement during which time Gamma would permit Thomas to buy back the north and south Wade Park properties by paying off the loans.

In April 2019, the buy-back period expired without Thomas having paid off the loans, and Gamma recorded the deeds to Wade Park.

On August 26, 2020, the Wade Park plaintiffs each filed for relief pursuant to Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Georgia. The following day, this suit was filed.

Plaintiffs assert fourteen counts against Defendants: declaratory judgment (Count I); violation of federal and Georgia Racketeer Influenced and Corrupt Organizations ("RICO") statutes (Counts II-V); fraud (Count VI); tortious interference with business relations (Count VII); breach of contract (Count VIII); unjust enrichment (Count IX); usury (Count X); avoidance, preservation and return of constructively fraudulent transfers (Count XI); avoidance, preservation and return of constructively voidable transfers (Count XII); punitive damages (Count XIII); and attorneys' fees and costs (Count XIV).

Although this suit was initially referred to the Bankruptcy Court for the Northern District of Georgia, on September 23 Defendants

moved [1] to withdraw the reference to the bankruptcy court and litigate this suit in the Northern District of Georgia. That motion was granted [4] on October 14. On October 16, Plaintiffs amended [5] their complaint.

On November 13, Goodman moved [13] to dismiss the amended complaint for failure to state a claim. That same day, the remaining Defendants separately moved [16] to dismiss and moved [14] to transfer this case to the Southern District of New York. Goodman later responded [18] to the motion to transfer.

On December 11, Plaintiffs responded [20, 21] to the motions to dismiss and responded [22] to the motion to transfer. Goodman later replied [25], as did the remaining Defendants [27, 28].

Now, the motions having ripened for review, the Court enters the following order.

## II. Goodman's Motion to Dismiss[1]

### A. Legal Standard

To survive a 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007); *see also Chandler v. Sec'y of Fla. Dep't of Transp.*, 695 F.3d 1194, 1199 (11th Cir. 2012). The Supreme Court has explained this standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

---

[1] On November 13, Goodman requested [15] oral argument on this motion. He represented to the Court that Joseph E. Hart, then serving as counsel in this matter, would conduct "the lion's share" of the argument.

Pursuant to Rule 19 of this Court's standing order, requests for oral argument regarding contested, substantive motions are granted as a matter of course if the request states that a lawyer of less than five years out of law school will conduct at least the lion's share of the motion.

However, on January 8, Goodman indicated that attorney Ethan M. Knott, an attorney who graduated from law school more than five years ago, would replace Hart as counsel in this matter. Accordingly, the motion will be denied as moot.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted); *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir. 2012).

Thus, a claim will survive a motion to dismiss only if the factual allegations in the complaint are "enough to raise a right to relief above the speculative level," and "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. While all well-pleaded facts must be accepted as true and construed in the light most favorable to the plaintiff, *Powell v. Thomas*, 643 F.3d 1300, 1302 (11th Cir. 2011), the Court need not accept as true plaintiff's legal conclusions, including those couched as factual allegations, *Iqbal*, 556 U.S. at 678.

**B. Discussion**

Against Goodman, Plaintiffs bring claims for (1) federal RICO violations; (2) federal RICO conspiracy; (3) Georgia RICO violations; (4) Georgia RICO conspiracy; (5) breach of fiduciary duty; (6) conspiracy to breach fiduciary duties; (7) misappropriation of trade secrets under the Georgia Trade Secrets Act ("GTSA"); (8) punitive damages; and (9) attorneys' fees.

Goodman contends that Plaintiffs fail to state a claim for relief as to these claims. He argues that Plaintiffs fail to plausibly allege: (1) a federal RICO violation; (2) a federal RICO conspiracy; (3) a Georgia RICO violation or conspiracy; (4) that he owed, breached, or conspired to breach a fiduciary duty; and (5) that he misappropriated trade secrets under the GTSA.

The Court will address each of these arguments in turn.

**1. Failure to Allege a Federal RICO Violation**

The federal RICO statute makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Though a criminal statute, it also provides a civil cause of action for "[a]ny person injured in his business or property." *Id.*

To plausibly allege a civil RICO violation, a plaintiff must show that "the defendants (1) operated or managed (2) an enterprise (3)

through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of the plaintiff." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020) (citing *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016)).

Goodman argues that the Plaintiffs fail to plausibly allege any of these elements.

First, Goodman urges that Plaintiffs have not plausibly alleged that he participated in an enterprise with Kalikow and the Gamma Defendants. Plaintiffs disagree, urging that they adequately alleged an association-in-fact enterprise.

An "association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 948 (2009). It "may be 'formal or informal,' and requires only 'three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *Al-Rayes v.*

*Willingham*, 914 F.3d 1302, 1307 (11th Cir. 2019) (quoting *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1067 (11th Cir. 2017)).

"The purpose prong contemplates 'a common purpose of engaging in a course of conduct' among the enterprise's alleged participants.'" *Cisneros*, 972 F.3d at 1211 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

Traditionally in this circuit, "the common purpose of making money was sufficient under RICO" to show an enterprise. *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1285 (11th Cir. 2006) (citing *United States v. Church*, 955 F.2d 688, 698 (11th Cir. 1992)).

But in *Cisneros*, 972 F.3d at 1211, the Eleventh Circuit found that "[a]n abstract common purpose, such as a generally shared interest in making money, will not suffice." Instead, "where the participants' ultimate purpose is to make money for themselves, a RICO plaintiff must plausibly allege that the participants shared the purpose of enriching themselves *through a particular criminal course of conduct*." *Id.* at 1211–12 (internal citations omitted).

Here, as in *Cisneros*, Plaintiffs have "alleged no facts to plausibly support the inference that the defendants were collectively trying to make money . . . by fraud, . . . as opposed to the 'obvious alternative explanation, . . . that they were simply trying to make money." *Id.* (citing *Twombly*, 550 U.S. at 567, and *Ray*, 836 F.3d at 1352–53).

Plaintiffs aver that Defendants, including Goodman, worked together "with the purpose [of] enriching themselves and defrauding Plaintiffs by taking Wade Park." [5] ¶ 252. They allege that Goodman shared Defendants' goal of acquiring Wade Park because he desired to start his own real estate firm, *id.* ¶ 220, and contend that he committed criminal acts to accomplish that goal—namely, misappropriation of trade secrets. *See id.* ¶¶ 220, 270–305.

These allegations do not show a RICO enterprise. At best, they describe an ambitious business model in which all Defendants aimed to achieve professional success through the acquisition of valuable real estate. And, taking Plaintiffs' averments as true, that Goodman committed fraud to accomplish that goal.

The Eleventh Circuit has rejected similar allegations as speculative, pointing out that

> The complaint contains no allegations about specific interactions between Petland Kennesaw and the other defendants, nor allegations regarding the origins or scope of the alleged scheme. Rather, Cisneros simply asks us to speculate that Petland Kennesaw decided at some point to pursue fraud, and that PAWSitive and Petland were involved in that decision. We will not indulge that speculation. Cisneros was required to allege not just that Petland Kennesaw had a fraudulent purpose, but that it was a *common* purpose, formed in collaboration with Petland, PAWSitive, and the preferred veterinarians.

*Cisneros*, 972 F.3d at 1214; *see also Ray*, 836 F.3d at 1352–53 (affirming dismissal of a RICO claim for failure to allege an enterprise because the plaintiff failed to plead that all participants shared the common purpose of defrauding him).

Because Plaintiffs plead only "at the highest order of abstraction that the participants shared a common 'purpose . . . to defraud,'" *Cisneros*, 972 F.3d at 1212, they have not brought their allegations across "the line between possibility and plausibility." *Twombly*, 550 U.S. at 557.

Moreover, even if Plaintiffs had plausibly alleged the existence of a RICO enterprise, they have not pled with particularity that Goodman engaged in a pattern of racketeering activity.

"To successfully allege a pattern of racketeering activity, plaintiffs must charge that: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a *continuing* nature." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir. 2004) (internal citations omitted).

"The continuity element of a pattern of racketeering activity is crucial to a valid RICO claim in order to ensure that the crime alleged is the sort of offense that RICO is designed to address—one that is part of a pattern of ongoing, continuing criminality or that involves criminality that promises to continue into the future." *Id.* at 1265.

There are two types of continuity. The first refers to a "closed period of repeated conduct." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241–42 (1989). "A party alleging a RICO violation may demonstrate

continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* at 242.

The second, open-ended iteration of continuity considers whether there is an ongoing threat of continuity. In such a case, a plaintiff may show either that "the racketeering acts by themselves include a specific threat of repetition extending indefinitely into the future," or that "the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.*

Here, Plaintiffs allege only a closed-ended enterprise. And they acknowledge that any predicate acts committed by Goodman do not satisfy the "substantial period of time" threshold because they lasted less than a year. *See Jackson*, 372 F.3d at 1266 ("Other circuits have agreed that the *substantial* period of time requirement for establishing closed-ended continuity cannot be met with allegations of schemes lasting less than a year.") (internal citations omitted). They nonetheless contend that the continuity element is satisfied by allegations that the predicate acts committed by the *enterprise* extended over a period of thirty months.

Even if that were the case, Plaintiffs allege that Defendants engaged only in a single scheme—fraudulent acquisition of Wade Park—aimed at a singular victim—Thomas—through manipulation of a single loan—the Gamma Bridge loan. This does not constitute a closed-ended pattern of racketeering.

Consider the analogous facts in *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 17 (1st Cir. 2000). There, the plaintiff, a limited partner in a hotel development project, alleged that the defendants, his partners, schemed to diminish the value of his investment so that they could obtain ownership of the project. The plaintiff alleged multiple related acts of deception, but each was "aimed at the single goal of transforming the ownership of the Partnership during its early stages." *Id.* at 18. Because the alleged racketeering activities were of a "finite nature . . . over a relatively modest period of time," they did not show the requisite closed-ended continuity and were instead more accurately described as a series of "racketeering acts . . . 'taken together [to] comprise a single effort' to facilitate a single financial endeavor." *Id.* at

19 (quoting *Schultz v. R.I. Hosp. Tr. Nat'l Bank, N.A.*, 94 F.3d 721, 732 (1st Cir. 1996)).

Similarly, in *Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000), a defendant carried out three schemes over a period of several years to defraud a close family friend of a significant amount of money. The plaintiff prevailed on his fraud claims, but his RICO claims were dismissed because "the narrow focus of the scheme here—essentially a dispute between formerly close family friends—combined with the commonplace predicate acts persuades us that the facts here do not satisfy the pattern requirement." *Id.* at 238.

And in *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1262 (D.D.C. 1995), the plaintiff, a developer, attempted to purchase an apartment building. A tenant in the building wrote an allegedly fraudulent personal check to exercise the tenants' collective statutory right of first refusal and cloud title to the building. That and subsequent efforts to delay the resulting quiet-title action stalled sale of the building for three years. The developer alleged that a RICO violation had occurred, but the D.C. Circuit concluded that there was no

closed-ended continuity sufficient to show a pattern of racketeering because each effort was part of a single scheme, with a single injury and only a few victims.

The Eleventh Circuit has since cited *Efron*, *Al-Abood*, and *Edmondson* with approval, *see Ferrell v. Durbin*, 311 F. App'x 253, 256 (11th Cir. 2009), and has reasoned that "where the RICO allegations concern only a single scheme with a discrete goal, the courts have refused to find a closed-ended pattern of racketeering activity even when the scheme took place over longer periods of time." *Jackson*, 372 F.3d at 1267.

Such is the case here. Because Plaintiffs' allegations show only predicate acts directed at a single victim with a singular goal, they have not alleged a closed-ended pattern of racketeering activity. Accordingly, they have not plausibly pled a RICO claim, and Goodman's motion to dismiss will be granted as to this claim.

### 2. Failure to Allege a Federal RICO Conspiracy

Pursuant to 18 U.S.C. § 1962(d), it is illegal to conspire to violate one of the substantive RICO statutes. "A plaintiff can establish a RICO

conspiracy claim in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir. 1997) (quoting *United States v. Church*, 955 F.2d 688, 694 (11th Cir. 1992)).

The parties debate whether Plaintiffs' federal RICO conspiracy claim can stand if there is no underlying substantive RICO violation.

In *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1296 n.6 (11th Cir. 2010), the Eleventh Circuit acknowledged that the Second, Third, Fourth, Sixth, Ninth, Tenth, and D.C. Circuits have explicitly held that if a plaintiff "fails to state a claim of a primary RICO violation, then the plaintiff's civil RICO conspiracy claim necessarily fails."

The Eleventh Circuit declined to expressly adopt such a rule in *American Dental Association*. However, it has held that "where a plaintiff fails to state a RICO claim and the conspiracy count does not contain additional allegations, the conspiracy claim necessarily fails."

*Rogers v. Nacchio*, 241 F. App'x 602, 609 (11th Cir. 2007); *see also Jackson*, 372 F.3d at 1269 (affirming the dismissal of a RICO conspiracy claim that "add[ed] nothing" and "simply conclude[d] that the defendants 'conspired and confederated' to commit conduct which in itself does not constitute a RICO violation"). In other words, if allegations of a substantive RICO violation are so speculative or conclusory that they fail to state a claim, then allegations of a conspiracy that are similarly lacking will also fail. This is merely application of *Iqbal*'s plausibility standard.

In considering whether Plaintiffs' complaint supports the inference that Defendants agreed to the overall objective of the conspiracy or to commit two predicate acts, the Court first "eliminate[s] any allegations . . . that are merely legal conclusions." *Am. Dental Ass'n*, 605 F.3d at 1293. After eliminating any conclusory allegations of conspiracy, the Court considers whether Plaintiffs' factual allegations plausibly suggest that a conspiracy exists. *Id.* at 1294.

Plaintiffs aver that Goodman communicated with the remaining Defendants multiple times, including, at one point, flying to meet them

in person. *See* [5] ¶ 239. They also allege that he agreed to work with them to acquire Wade Park. *See id.* ¶ 246.

From these discussions, Plaintiffs extrapolate that Goodman conspired with Defendants by sharing trade secrets for pecuniary gain. *See id.* ¶ 238 ("During some of these calls, on information and belief, Goodman shared the Thomas-Wade Park Trade Secrets with Kalikow and the Gamma Defendants.").

But Plaintiffs' allegations that Goodman conspired with the remaining Defendants to commit fraud are merely legal conclusions. There is an "obvious alternative explanation" for the factual allegations here—namely, the business relationship among Goodman, Cathy, Thomas, and the remaining Defendants. Because there is a "'natural explanation' for [D]efendants' alleged conduct that help[s] to foreclose Plaintiffs' suggestion of conspiracy" and instead "suggests lawful, independent conduct," *Am. Dental Ass'n*, 605 F.3d at 1295 (citing *Twombly*, 550 U.S. at 568), Plaintiffs have not plausibly alleged sufficient facts regarding Goodman's agreement with the remaining

Defendants to engage in an ongoing criminal enterprise. Accordingly, Plaintiffs' RICO conspiracy claim is due to be dismissed as to Goodman.

**3. Failure to Allege a Georgia RICO Violation or Conspiracy**

"The Georgia RICO Act is modeled on the federal RICO statute and, in the absence of Georgia authority, Georgia courts often look to federal decisions for guidance on the interpretation of similar provisions of the Georgia RICO Act." *Functional Prods. Trading, S.A. v. JITC, LLC*, No. 1:12-cv-355-WSD, 2014 WL 3749213, at *3 (N.D. Ga. July 29, 2014) (citing *Williams Gen. Corp. v. Stone*, 279 S.E.2d 428, 430 (Ga. 2005)).

However, "Georgia RICO is generally broader in scope than federal RICO." *Marshall v. City of Atlanta*, 195 B.R. 156, 171 (N.D. Ga. 1996) (internal citations omitted). The Georgia RICO statute does not require proof of an enterprise, nor does it require that the pattern of racketeering activity be continuing. *See id.*; *see also Dover v. State*, 385 S.E.2d 417, 420–21 (Ga. Ct. App. 1989). Instead, to plead a violation of Georgia's RICO statute, a plaintiff must plead only that the accused "through a pattern of racketeering activity or proceeds derived

therefrom . . . acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property or personal property of any nature, including money." *Cobb Cnty. v. Jones Grp., P.L.C.*, 460 S.E.2d 516, 520–21 (Ga. Ct. App. 1995) (quoting O.C.G.A. § 16-14-4(a)).

Nevertheless, Plaintiffs must plausibly allege that Goodman engaged in a pattern of racketeering activity, meaning that he "committed predicate offenses . . . at least twice." *Williams v. Unum Life Ins. Co. of Am.*, No. 1-07-cv-240-JOF, 2007 WL 2479561, at *2 (N.D. Ga. Aug. 27, 2007) (quoting *Cobb Cnty.*, 460 S.E.2d at 522). Predicate acts under Georgia law include those that constitute a federal RICO violation. *Tom's Amusement Co. v. Total Vending Servs.*, 533 S.E.2d 413, 419 (Ga. Ct. App. 2000) (citing O.C.G.A. § 16-14-3(9)(A)(xxix)).

Plaintiffs allege that Goodman shared confidential information during his communications with Kalikow and in doing so committed the predicate offense of theft of trade secrets.[2] *See* [5] ¶¶ 237–41. They aver,

---

[2] In their amended complaint, Plaintiffs allege that Defendants, including Goodman, committed a wide variety of predicate acts, including wire fraud, theft of trade secrets, money laundering, violation of the Georgia Uniform Securities Act, and theft by deception. *See* [5] ¶ 359. But in response to Goodman's argument that

for instance, that the Gamma Defendants must have gleaned trade secrets from Goodman because "[n]either Thomas, Wade Park Land, nor Wade Park Land Holdings shared the . . . Trade Secrets" yet the Gamma Defendants later possessed them. *Id.* ¶ 241.

Goodman objects to such a logical leap, pointing out that Plaintiffs plead their allegations only on "information and belief" and fail to plausibly allege that any confidential information was in fact shared.

"A party's allegations are not due to be automatically discredited or otherwise disregarded based solely upon the use of the phrase 'on information and belief.'" *Interra Int'l, LLC v. Al Khafaji*, No. 1:16-cv-1523-MHC, 2017 WL 4866266, at *10 n.5 (N.D. Ga. Mar. 21, 2017) (internal citations omitted).

However, to state a claim for relief, Plaintiffs must do more than baldly allege that Goodman must have shared trade secrets because the Gamma Defendants acquired knowledge of the information.

---

he did not engage in wire fraud or money laundering, Plaintiffs clarify that they allege only predicate acts related to theft of trade secrets.

Their allegations cannot stand based on "a sheer possibility that [Goodman] . . . acted unlawfully" because this "stops short of the line between possibility and plausibility of entitlement to relief." *Putters v. Rmax Operating, LLC*, No. 1:13-cv-3382-TWT, 2014 WL 1466902, at *3 (N.D. Ga. Apr. 15, 2014) (quoting *Iqbal*, 556 U.S. at 678).

Because Plaintiffs do not plausibly allege that Goodman shared trade secrets with the remaining Defendants, Plaintiffs' claims of Georgia RICO violation and conspiracy are due to be dismissed as to Goodman.

#### 4. Failure to Allege Misappropriation of Trade Secrets

In Count XVI, Plaintiffs bring a separate claim for misappropriation of trade secrets under the Georgia Trade Secrets Act, O.C.G.A. § 10-1-760, *et seq*. Misappropriation may occur either where there is "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," or where there is "[d]isclosure or use" of the trade secret "without express or implied consent." §§ 10-1-761(2)(A), (B).

Plaintiffs allege that Goodman disclosed trade secrets without express or implied consent. But for the reasons enumerated above, they fail to plausibly allege that any disclosure occurred. Accordingly, Count XVI will be dismissed as to Goodman as well.

#### 5. Failure to Allege Ownership, Breach, and Conspiracy to Breach a Fiduciary Duty

As a final matter, Plaintiffs allege that Goodman owed fiduciary duties and breached those duties through his interactions with the remaining Defendants.

In seeking dismissal, Goodman argues that Plaintiffs fail to plausibly allege that he either owed them fiduciary duties or breached his duties.

Under Georgia law, to plead a breach of fiduciary duty, a plaintiff must allege "(1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach." *Griffin v. Fowler*, 579 S.E.2d 848, 850 (Ga. Ct. App. 2003). "A fiduciary duty exists 'where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost

good faith.'" *Estate of Bass v. Regions Bank, Inc.*, 947 F.3d 1352, 1359 (11th Cir. 2020) (quoting Ga. Code. Ann. § 23-2-58).

Goodman contends that he does not owe Plaintiffs any fiduciary duties, as he is not a party to the joint venture agreement and is only a manager of FQP (rather than a member or a party to its operating agreement).

Plaintiffs, on the other hand, urge that the written joint venture agreement memorializes only *part* of the parties' agreement, and that Goodman is a member of the joint venture pursuant to a separate oral agreement. They also argue that Goodman took on the role of manager in FQP "in accordance" with the joint venture, such that his managerial role "supports the inference of a fiduciary relationship." [21] at 43 (quoting [5] ¶ 217).

The Court is unpersuaded. Essentially, Plaintiffs argue that at the same time the parties were negotiating the terms of a complex business agreement that their lawyers were reducing to writing, they were simultaneously negotiating a separate, broader, *oral* agreement. This was a sophisticated business transaction worth hundreds of millions of

dollars. Plaintiffs' argument that there were actually *two* deals—the written one and a separate, verbal one—is so inherently implausible as to fail the *Twombly* standard. The Court will not read into the amended complaint the existence of fiduciary duties based on Plaintiffs' allegation that the parties orally entered into a joint venture that included Goodman.

Moreover, even if the parties had orally agreed that Goodman would be a member in their joint venture, such membership does not automatically give rise to fiduciary duties. *See Vitner v. Funk*, 354 S.E.2d 666, 669–70 (Ga. Ct. App. 1987) (pointing out that membership in a joint venture agreement *may* give rise to fiduciary duties). Here, Plaintiffs have not pleaded either that Goodman exercised a controlling influence over them or that he interacted with them from a position of mutual confidence such that Plaintiffs might reasonably believe that a confidential relationship existed. *See Kienel v. Lanier*, 378 S.E.2d 359, 361 (Ga. Ct. App. 1989) ("[T]he mere fact that two persons have transacted business in the past based on oral commitments or understandings and that they have come to repose trust and confidence

in each other as the result of such dealings is not sufficient, in and of itself, to warrant a finding that a confidential relationship exists between them.") (internal citations omitted).

And even if Plaintiffs had plausibly alleged that Goodman owed them fiduciary duties, they have not plausibly alleged that he breached or conspired to breach those duties. As the Court has already noted, their allegations that Goodman shared trade secrets or other confidential information with the remaining Defendants are far too conclusory to satisfy the pleading standard. Accordingly, their claim for breach of fiduciary duty is due to be denied as to Goodman.

For the foregoing reasons, Goodman's motion to dismiss will be granted.

## III. Motion to Transfer

### A. Legal Standard

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a).

“Federal courts traditionally have accorded a plaintiff’s choice of forum considerable deference,” *In re Ricoh Corp.*, 870 F.2d 570, 573 (11th Cir. 1989) (en banc), and “unless the balance is strongly in favor of the defendant, the plaintiff’s choice of forum should rarely be disturbed,” *Moore v. McKibbon Bros., Inc.*, 41 F. Supp. 2d 1350, 1356 (N.D. Ga. 1998) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)). Thus, in situations involving motions to transfer under § 1404(a), the moving party typically bears the burden of establishing that transfer is appropriate. *In re Ricoh*, 870 F.2d at 573.

When, however, the parties agree to a valid, mandatory forum-selection clause, “the burden of persuasion is altered” such that it is the non-movant who “bears the burden of persuading the court that the contractual forum is sufficiently inconvenient to justify retention of the dispute.” *Id.* In other words, valid, mandatory forum-selection clauses are “given controlling weight in all but the most exceptional cases.” *Id.* at 573 n.6 (citing *Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988) (Kennedy, J., concurring)).

In considering a motion to transfer, the Eleventh Circuit has found that § 1404(a) requires district courts to consider the following factors: (1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of circumstances. *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005).

However, "[t]he presence of a forum selection clause . . . will be a significant factor that figures centrally in the district court's calculus." *Stewart Org.*, 487 U.S. at 29. Thus, "while other factors might 'conceivably' militate against a transfer . . . the venue mandated by a choice of forum clause rarely will be outweighed by other 1404(a) factors." *In re Ricoh Corp.*, 870 F.2d at 573.

### B. Discussion

The Gamma Defendants and Kalikow move to transfer the case to the Southern District of New York. They argue that transfer is appropriate because the parties agreed in ten mandatory forum-selection clauses that New York is the appropriate forum for this matter.

Plaintiffs argue that the forum-selection clauses are permissive rather than mandatory and that they are invalid because they were procured by fraud. They also contend that the clauses are too limited in scope to justify transfer of this case and urge the Court to apply the full range of § 1404(a) factors in finding that transfer is not warranted.

The Court will consider each argument in turn.

#### 1. Mandatory and Permissive Forum-Selection Clauses

Forum-selection clauses are characterized as either "permissive" or "mandatory." *Glob. Satellite Commc'n Co. v. Starmill U.K. Ltd.*, 378 F.3d 1269, 1272 (11th Cir. 2004). "A permissive clause authorizes jurisdiction in a designated forum but does not prohibit litigation elsewhere,' whereas '[a] mandatory clause . . . 'dictates an exclusive

forum for litigation under the contract.'" *Slater v. Energy Servs. Grp. Int'l, Inc.*, 634 F.3d 1326, 1330 (11th Cir. 2011) (quoting *Glob. Satellite*, 378 F.3d at 1272).

Plaintiffs divide the ten forum-selection clauses identified by Defendants into two categories. They argue that both categories contain only permissive clauses.

The first category of forum-selection clauses is comprised of provisions in nine agreements: the Gamma Bridge loan, the loan modification agreement, the six forbearance agreements, and the deed-in-lieu-of-foreclosure agreement. The forum-selection clauses in these agreements are identical in all pertinent respects and provide that

> [a]ny legal suit, action or proceeding against lender or any obligor arising out of or relating to this agreement or the GRE loan documents or the BAMCAP loan document may at lender's option be instituted in any federal or state court in the city of New York, county of New York, pursuant to section 5-1402 of the New York general obligations law and each obligor waives any objections which it may now or hereafter have based on venue and/or forum non conveniens of any such suit, action or proceeding, and borrower hereby irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding.

*See* [17-11] ¶ 18.

Plaintiffs argue that this provision is permissive because, in the Eleventh Circuit, a forum-selection clause is not mandatory if "the terms of the agreement allow the Lender to make an election," but the lender "opt[s] to file suit in another forum" and "nothing in the contract language prohibit[s] such a choice." [22] at 15 (quoting *PNC Bank, Nat'l Ass'n v. GVTG, LLC*, 592 F. App'x 775, 778 (11th Cir. 2014)).

In so arguing, Plaintiffs urge that federal common law, not state law, governs the interpretation of forum-selection clauses. *Id.* (citing *Cornett v. Carrithers*, 465 F. App'x 841, 842 (11th Cir. 2012)).

In the unpublished *Cornett* decision, the Eleventh Circuit opined that "the construction of forum selection clauses by federal courts is a matter of federal common law, not state law of the state in which the federal court sits." *Cornett*, 465 F. App'x at 843 (quoting *P & S Bus. Machs., Inc. v. Canon USA, Inc.*, 331 F.3d 804, 807 (11th Cir. 2003)). Since then, courts in this circuit have concluded that "[t]o interpret the meaning of the forum-selection clauses, the Court applies federal common law." *PNC Bank, N.A. v. Akshar Petroleum, Inc.*, No. 3:13-cv-

436-J-34PDB, 2014 WL 1230689, at *3 (M.D. Fla. Mar. 25, 2014) (citing *Cornett*, 465 F. App'x at 842).

But the Eleventh Circuit has never published a decision binding lower courts to apply federal common law, and it has since called into question the veracity of its *Cornett* ruling. *See Wylie v. Kerzner Int'l Bah. Ltd.*, 706 F. App'x 577, 580 (11th Cir. 2017). In *Wylie*, the court acknowledged that there was "potentially . . . a problem because . . 'state-law principles [generally] govern the formation of contracts . . . . Yet, in deciding whether to enforce a forum-selection clause, federal law governs even in diversity suits." *Id.* (internal citations omitted). The court ultimately remanded the case to the district court, but not before making the following point:

> It seems to us, then, that the analytical framework (and substantive law) governing the forum non conveniens inquiry in this diversity case depends on whether the validity of a forum-selection clause is distinct from, and antecedent to, its enforceability, or whether the validity of such a clause is just part of the federal law of enforceability, as developed in *Bremen* and expounded in *Atlantic Marine*. As the Fifth Circuit recently recognized in *Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 300–02 (5th Cir. 2016), the Supreme Court has not answered this question. And neither have we.

*Id.* (citing *Atlantic Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 62 (2013).

Other circuit courts have also recognized that a "daunting question" persists: whether state law, which controls the substantive provisions of the contract, might govern the validity of a forum-selection clause even if federal law governs the procedural rules related to the clause's enforceability. *See Lambert v. Kysar*, 983 F.2d 1110, 1116–17 (1st Cir. 1993) (avoiding determining "whether forum selection clauses are to be treated as substantive or procedural for *Erie* purposes" by concluding that there was "no material discrepancy between Washington state law and federal law").

Many of these courts have concluded that the validity of a forum-selection clause is a substantive matter of state law. *See Barnett*, 831 F.3d at 302; *Martinez v. Bloomberg LP*, 740 F.3d 211, 218 (2d Cir. 2014) (concluding that while "[f]ederal law must govern the ultimate enforceability of a forum selection clause" . . . state law governs the interpretive question of whether a forum-selection clause is mandatory

or permissive (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 15, 18 (1972))); *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 386 (2d Cir. 2007) ("[W]e cannot understand why the interpretation of a forum selection clause should be singled out for application of any law other than that chosen to govern the interpretation of the contract as a whole."); *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 195 (3d Cir. 1983), *overruled on other grounds by Lauro Lines v. Chasser*, 490 U.S. 495, 495 (1989).

Defendants argue for adoption of this approach, contending that the parties' contractually agreed-upon choice of law should govern.

The importance of the applicable law is this: while a New York court has found that a provision stating that a legal action "may at lender's option be instituted" is mandatory, *see Trump v. Deutsche Bank Tr. Co. Ams.*, 65 A.D.3d 1329, 1330 (N.Y. App. Div. 2009), the Eleventh Circuit has found—applying federal common law—that language stipulating that "the terms of the agreement allow the Lender to make an election" is permissive. *See PNC*, 592 F. App'x at 778. Thus, if

federal common law applies here, the provision is permissive; if state law applies, the provision is mandatory.

Fortunately, the Court need not weigh into this fray. Defendants also argue that transfer is appropriate based upon the remaining forum-selection clause, which Plaintiffs separate into a second, distinct category. The Court agrees.

The second category is comprised of a single clause: the forum-selection clause in WPV's Limited Liability Company Agreement (the "LLCA"). The forum-selection clause in the LLCA provides that

> [f]or the purposes of any suit, action or proceeding involving this Agreement, the parties each hereby expressly and irrevocably submits [sic] to the jurisdiction of all federal and state courts sitting in the State of New York which courts shall have jurisdiction over any such suit, action or proceeding commenced by any party. The parties consent to service of process, wherever made, by certified mail return receipt requested, personal service or any other method permitted by applicable law and the rules of the applicable court. In furtherance of such agreement, the parties agree, upon the request of any party, to discontinue (or agree to the discontinuance of) any such suit, action or proceeding pending in any other jurisdiction.

[17-2] § 11.6(b). The LLCA also states that "[t]his Agreement will be governed by, and construed in accordance with, the laws of the State of Delaware without regard to conflict of law principles." *Id.* § 11.6(a).

Plaintiffs argue that in the Eleventh Circuit, "submitting" to jurisdiction indicates the parties' permissive consent to jurisdiction, not selection of an exclusive, mandatory venue. *See* [22] at 19 (citing *Keaty v. Freeport Indon., Inc.*, 503 F.2d 955, 956–57 (5th Cir. 1974)).

That may be, but the LLCA's forum-selection clause also directs that New York courts "shall have jurisdiction over" "any suit, action or proceeding involving this Agreement." [17-2] ¶ 11.6(b). The parties also agree, upon request, to discontinue any action outside of New York. *Id.*

A provision stating that a court "shall" have jurisdiction over any dispute generally indicates a mandatory grant of jurisdiction. *See Slater*, 634 F.3d at 1330 ("The contract provision . . . because it uses the imperative 'shall,' is most reasonably interpreted to mandate venue . . . ." (quoting *Glob. Satellite*, 378 F.3d at 1272)); *see also MoistTech*

*Corp. v. Sensortech Sys., Inc.*, No. 8:15-cv-434-EAK-TBM, 2015 WL 3952341, at *5–6 (M.D. Fla. June 26, 2015).[3]

Though at times in their briefing Plaintiffs argue that use of the term "shall" is indicative of a mandatory forum-selection clause, *see* [22] at 12 ("To be mandatory, a forum-selection clause must contain specific language of exclusivity—that is, the clause must state that the designated jurisdiction is 'exclusive,' or that the litigation 'must' or 'shall' be pursued in the designated venue"), they point at this juncture to an unpublished Eleventh Circuit decision affirming that "the word 'shall' . . . does not also connote exclusivity in all circumstances." *See First State Bank of Nw. Ark. v. Ga. 4-S Invs. LLP*, 418 F. App'x 838, 839 (11th Cir. 2011).

However, the *First State Bank* opinion demonstrates only that the word "shall" may under certain circumstances be used as part of a permissive clause. This is not one of those circumstances. Not only does

[3] The Court notes that it need not decide whether state or federal law is applicable to this provision. Though federal common law is cited above, Delaware state law—which the parties agreed should govern the LLCA—has also found provisions including the term "shall" to be mandatory. *See Ashall Homes Ltd. v. ROK Entm't Grp. Inc.*, 992 A.2d 1239, 1250 (Del. Ch. 2010).

the provision here use the word "shall," but the parties also expressly agree to discontinue any suit in any other jurisdiction, should any party request it. Considering these provisions in conjunction with one another, the forum-selection clause is unambiguous: the parties agreed that their dispute would be litigated in New York.[4] This is a mandatory forum-selection clause.

As a final matter, Defendants argue that all of Plaintiffs' claims are within the scope of the broad forum-selection clause in the LLCA, which provides that "any suit, action or proceeding involving" the LLCA shall be litigated in New York. [17-2] § 11.6(b). They also argue that the forum-selection clause binds all Plaintiffs and can be enforced by all Defendants because they are either party to the LLCA or closely related to one of its signatories.

With the exception of Goodman, against whom all claims will be dismissed pursuant to this order, Plaintiffs do not dispute either point.

---

[4] Even if there were any ambiguity, the parties acknowledged in the LLCA "that they were represented by separate and independent Counsel in connection with the review, negotiation and drafting of this Agreement and that this Agreement shall not be subject to the principle of construing its meaning against the drafter." [17-2] § 11.13.

In other words, they do not contest Defendants' assertion that the Wade Park Plaintiffs are bound by the forum-selection clause because they are closely related to Plaintiff the Thomas Family Trust, which is a party to the LLC.

Nor would such an argument be fruitful. The Eleventh Circuit has concluded that "a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses." *Stiles v. Bankers Healthcare Grp., Inc.*, 637 F. App'x 556, 562 (11th Cir. 2016) (quoting *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988)). It has also construed forum-selection clauses broadly, holding that "all claims or causes of action relating to or arising from" an agreement included all claims derived "directly or indirectly" from the contractual relationship. *See Slater*, 634 F.3d at 1331. Accordingly, the mandatory forum-selection clause in the LLCA applies to all of Plaintiffs' claims and binds all Plaintiffs and the remaining Defendants.

### 2. Validity of the Forum-Selection Clause in the LLCA

Mandatory forum-selection clauses are "presumptively valid and enforceable." *Krenkel v. Kerzner Int'l Hotels Ltd.*, 579 F.3d 1279, 1281 (11th Cir. 2009). However, that presumption may be overcome by a "strong showing" indicating that (1) its formation was induced by fraud or overreaching; (2) the plaintiff would be deprived of its day in court because of inconvenience or unfairness; (3) the chosen law would deprive the plaintiff of a remedy; or (4) enforcement of the clause would contravene public policy. *Id.* at 1281; *see also M/S Bremen*, 407 U.S. at 10.

Here, Plaintiffs allege that the forum-selection clauses were procured by fraud. *See* [5] ¶¶ 101–106.

To invalidate a forum-selection clause based on fraud, the plaintiff "must specifically allege that the clause was included in the contract at issue because of fraud." *Rucker v. Oasis Legal Fin., LLC*, 632 F.3d 1231, 1238 (11th Cir. 2011) (pointing out that "[a] forum selection clause is viewed as a separate contract that is severable from the agreement in which it is contained").

In their briefing, Plaintiffs argue that their averments "are not just general allegations of fraud; they are distinct and specific to the forum-selection clauses." [22] at 24.

The Court disagrees. Plaintiffs include no facts to support their claim that the forum-selection clauses were procured by fraud, and indeed make no mention of the Eleventh Circuit's two-part "reasonable communicativeness" test for determining whether the presence of fraud should invalidate a forum-selection clause. *See Lebedinsky v. MSC Cruises, S.A.*, 789 F. App'x 196, 200 (11th Cir. 2019).

Instead, Plaintiffs allege, for instance, that "the forum-selection clauses were included in the agreements at issue as a result of the Gamma Defendants' fraud." [5] ¶ 104. Such claims are far too conclusory to make the requisite "strong showing." *See McArthur v. Kerzner Int'l Bah. Ltd.*, 607 F. App'x 845, 847 (11th Cir. 2015) (quoting *Pappas v. Kerzner Int'l Bah. Ltd.*, 585 F. App'x 962, 965 (11th Cir. 2014)). As this Court has previously explained,

> Particularly egregious allegations of fraud might provide an exception to the enforcement of a forum selection clause. Where, as here, however, the allegations are those which are commonly alleged between parties when a business deal goes

> sour, this court is unpersuaded that the original understanding of the parties should not be enforced. Plaintiffs have failed to provide sufficient reasons to overcome the "significant factor that figures *centrally* in the district court's calculus"—the forum selection clause.

*Picken v. Minuteman Press Int'l, Inc.*, 854 F. Supp. 909, 912 (N.D. Ga. 1993) (quoting *Stewart*, 487 U.S. at 29); *see also Rucker*, 632 F.3d at 1236 ("By requiring the plaintiff to *specifically* allege that the [forum selection] clause itself was included in the contract due to fraud . . . courts may ensure that more general claims of fraud will be litigated *in the chosen forum*, in accordance with the contractual expectations of the parties." (quoting *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1296 (11th Cir. 1998))) (some emphasis added).

Thus, Plaintiffs have plainly failed to plausibly allege that the forum-selection clause in the LLC was procured by fraud. Accordingly, the provision is valid and enforceable.

### 3. Extraordinary Circumstances

Because a valid and enforceable forum-selection clause exists, the Court will transfer this matter unless Plaintiffs show that there are "extraordinary circumstances unrelated to the convenience of the

parties" that justify denying the transfer. *Atl. Marine*, 571 U.S. at 62. The Court weighs public interest factors to determine whether extraordinary circumstances disfavor transfer, but such factors "rarely defeat a transfer motion, [and] the practical result is that [the] forum-selection clause[] should control . . . ." *Id.* at 64.

Here, Plaintiffs argue that public policy favors keeping this case in Georgia because it is tied to an ongoing bankruptcy proceeding. They also contend that there is a public interest in efficiently adjudicating all claims in a single forum such that the Court should not sever Plaintiffs' claims against the Gamma Defendants and transfer those claims to New York while keeping the claims against Goodman.

Because the Court will grant Goodman's motion to dismiss, Plaintiffs' second point is moot. With regard to the first, it is true that public policy favors "maintaining the venue of an adversary proceeding where the bankruptcy [proceeding] is pending." *In re Bavaria Yachts USA, LLLP*, 575 B.R. 540, 558 (Bankr. N.D. Ga. 2017) (citing *In re Hechinger Inv. Co. of Del., Inc.*, 288 B.R. 398, 402 (Bankr. D. Del. 2003)). However, if the adversary proceeding involves primarily non-

core claims, the forum-selection clause need not be abandoned. *See id.* (quoting *In re McCrary & Dunlap Constr. Co.*, 256 B.R. 264, 266 (Bankr. M.D. Tenn. 2000)).

The Wade Park Plaintiffs have bankruptcy cases pending in this district. However, in their motion to withdraw the reference to the bankruptcy court, Plaintiffs argued that "nearly all the claims alleged by Plaintiffs – RICO violations, breach of contract, and various forms of tortious misconduct by Defendants – are non-core claims." [1] at 18. The Court agreed and granted [4] the motion.

Because Plaintiffs previously represented to the Court that this dispute primarily concerns non-core claims, their present argument that the existence of some core claims weighs against transfer is unpersuasive. They have not met their burden of showing that "public-interest factors *overwhelmingly* disfavor a transfer." *Atl. Marine*, 571 U.S. at 67 (emphasis added).

Accordingly, the Court will grant Defendants' motion to transfer.

## IV. Conclusion

Goodman's motion [13] to dismiss is granted; his motion [15] for oral argument is denied. Defendants' motion [14] to transfer is granted. The Clerk is directed to transfer this case to the Southern District of New York.

IT IS SO ORDERED this 24th day of February, 2021.

Timothy C. Batten, Sr.
United States District Judge